RECEIPT #_____
AMOUNT $_____
SUMMONS ISSUED__2__
LOCAL RULE 4.1_____
WAIVER FORM _____
MCF ISSUED_____
BY DPTY. CLK._____
DATE___2-24-04___

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

COLUMBIA MANAGEMENT ADVISORS, INC.
and COLUMBIA FUNDS DISTRIBUTOR, INC.,

Defendants.

CIVIL ACTION NO.

04 10367 GAO

TRIAL BY JURY
DEMANDED

MAGISTRATE JUDGE_____

---

# COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges that:

## SUMMARY

1. From as early as 1998 and continuing through October 2003, Columbia Management Advisors, Inc. and its predecessor entities ("Columbia Advisors"), the investment adviser to over 140 of the mutual funds in the Columbia mutual fund complex (the "Columbia Funds"), and Columbia Funds Distributor, Inc. ("Columbia Distributor"), the distributor of those funds, allowed certain preferred customers to engage in short-term or excessive trading and never disclosed this fact to other investors.

2. During this period, Columbia Distributor secretly entered into arrangements with at least nine companies and individuals, allowing them to engage in frequent short-term trading in at least seven Columbia Funds, including international funds and a fund aimed at young investors. Columbia Management Advisors knew and approved of all but one of the short-term

trading arrangements, and it allowed the arrangements to continue despite knowing such trading could be detrimental to long-term shareholders in the funds. These arrangements increased the advisory fees earned by Columbia Advisors and the compensation paid to Columbia Distributor.

3. The Defendants entered into and/or approved these arrangements despite the fact that they knew or suspected that these investors were engaged in "market timing." After entering into these arrangements, the nine companies and individuals engaged in frequent short-term or excessive trading in at least sixteen different Columbia Funds.

4. Further, in connection with certain of the arrangements, Columbia Distributor insisted upon receiving so-called "sticky assets" – long-term investments that were to remain in place in return for allowing the investors to actively trade in the funds. In some cases, Columbia Distributor required investors who wanted to engage in frequent short-term trading in certain Columbia Funds to place long-term assets in other Columbia Funds. Such arrangements benefited Columbia Advisors and Columbia Distributor, but posed risks for investors in the funds in which short-term trading was allowed.

5. Throughout the relevant period, the Defendants never disclosed to the long-term shareholders of the Columbia Funds or to the independent trustees of the Columbia Funds the special arrangements they made with these short-term or excessive traders and the potential harm these arrangements posed to the relevant Columbia Funds. The Defendants also did not disclose the resulting conflicts of interest these arrangements created between Columbia Advisors and its clients. Nor did the Defendants disclose the conflicts of interest created by the disparate treatment of investors in the same fund, which was a result of these arrangements (*i.e.*, while

2

investors with special arrangements were allowed to engage in frequent trading, those without such arrangements were not). These non-disclosures constituted material omissions of fact.

6. Further, many of these arrangements and the trades made pursuant to them were directly contrary to certain representations that Columbia Advisors made to investors that the funds did not permit market timing or other short-term or excessive trading because of its harmful effect on the funds. In other cases, these arrangements and trades were contrary to representations that the funds involved would allow no more than three or four exchanges per fund per year. These materially misleading statements and omissions were contained in fund prospectuses that both Columbia Advisors and Columbia Distributor issued to clients and potential clients.

7. Columbia Advisors also had a fiduciary duty to act at all times in the best interests of investors in the Columbia Funds. As a result, Columbia Advisors had an affirmative obligation to act in the utmost good faith, and to provide full and fair disclosure of all material facts, including conflicts of interest, to investors and to the independent trustees of the Columbia Funds. It further had an affirmative obligation to act with reasonable care to avoid misleading investors.

8. By placing its own interest in generating fees from short-term or excessive traders above the interests of long-term shareholders to whom this trading posed a risk of harm, and by failing to disclose these arrangements and the conflicts of interest they created, Columbia Advisors, aided and abetted by Columbia Distributor, breached its fiduciary duty to shareholders in the funds where the short-term or excessive trading took place.

9. By engaging in the transactions and practices alleged in this Complaint,

   a. Columbia Advisors and Columbia Distributor violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5];

   b. Columbia Advisors and Columbia Distributor violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)];

   c. Columbia Advisors and Columbia Distributor violated Section 17(d) of the Investment Company Act of 1940 ("Investment Company Act") and Rule 17d-1 thereunder [15 U.S.C. § 80a-17(d) and 17 C.F.R. § 270.17d-1];

   d. Columbia Advisors violated, and Columbia Distributor aided and abetted violations of, Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6 (1) and (2)];

   e. Columbia Advisors violated Section 34(b) of the Investment Company Act [15 U.S.C. § 80a-33(b)]; and

   f. Columbia Distributor violated Section 15(c) of the Exchange Act [15 U.S.C. § 78o(c)].

10. Unless enjoined, the Defendants will continue to engage in acts, practices, and courses of business as set forth in this Complaint or in acts, practices, and courses of business of similar object and purpose. Accordingly, the Commission seeks the following against each Defendant: (i) entry of a permanent injunction prohibiting it from further violations of the relevant provisions of the federal securities laws; (ii) restitution to investors in the relevant Columbia Funds; (iii) disgorgement of all ill-gotten gains, plus prejudgment interest thereon; and (iv) imposition of civil monetary penalties. In addition, the Commission requests (v) an order permanently enjoining Columbia Advisors from serving or acting with respect to any investment company as an officer, director, member of any advisory board, investment advisor, depositor, or

principal underwriter; and (vi) such other equitable relief as the Court deems just and appropriate.

## JURISDICTION

11.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa], Section 214 of the Advisers Act [15 U.S.C. § 80b-14] and Section 42 of the Investment Company Act [15 U.S.C. § 80a-41]. Additionally, the acts and practices alleged herein occurred primarily within the District of Massachusetts.

12.     The Commission brings this action pursuant to the authority conferred upon it by Section 20 of the Securities Act [15 U.S.C. § 77t], Section 21 of the Exchange Act [15 U.S.C. § 78u], Section 209 of the Advisers Act [15 U.S.C. § 80b-9], and Sections 36(a) and 42 of the Investment Company Act [15 U.S.C. §§ 80a-35(a), 80a-41].

13.     In connection with the conduct alleged herein, the Defendants, directly and indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, the facilities of national securities exchanges, and/or of the means and instruments of transportation or communication in interstate commerce.

## DEFENDANTS

14.     **Columbia Management Advisors, Inc. ("Columbia Advisors")**, an Oregon corporation formerly known as Columbia Management Company, is a wholly-owned subsidiary of Columbia Management Group, Inc. ("Columbia Management"), which is a wholly-owned subsidiary of FleetBoston Financial Corporation ("Fleet"). Columbia Advisors, which has offices

in Boston, has been an investment adviser registered with the Commission since 1969. In connection with its purchase of Liberty Financial Group ("Liberty") in November 2001, Fleet acquired various Liberty fund groups and investment advisers. The Liberty investment advisers included Liberty Advisory Services Corp., Colonial Management Associates, Inc., Stein Roe and Farnham Inc., Newport Pacific Management, Inc., Newport Fund Management, Inc., and Columbia Funds Management Company. In April 2003, these entities were merged with Fleet Investment Advisors Inc. into Columbia Advisors. (Six of the Columbia Funds, including the Acorn Fund Group, continue to be advised by a separate entity, Liberty Wanger Asset Management.) Columbia Advisors is presently the sponsor of approximately 140 Columbia Funds and remains responsible for all representations made in the prospectuses for those funds.

15. **Columbia Funds Distributor, Inc. ("Columbia Distributor ")**, a Massachusetts corporation with offices in Boston, is a wholly-owned subsidiary of Columbia Management and indirect subsidiary of Fleet. Columbia Distributor has been a broker-dealer registered with the Commission since 1992. It acts as the principal underwriter and distributor for the Columbia Funds and, in this role, disseminates the prospectuses for the Columbia Funds. Prior to the acquisition of Liberty in November, 2001, it went by the name of Liberty Funds Distributor, Inc.

### RELATED ENTITY

16. **Columbia Fund Services, Inc. (" Columbia Services")**, a subsidiary of Columbia Management, is the transfer agent for the Columbia Funds, with responsibility for identifying market timing activity in the funds. Prior to the acquisition of Liberty in November 2001, it went by the name of Liberty Fund Services, Inc.

## FACTS

### Market Timing

17.     Market timing includes (a) frequent buying and selling of shares of the same mutual fund or (b) buying or selling mutual fund shares in order to exploit inefficiencies in mutual fund pricing. Market timing, while not illegal *per se*, can harm other mutual fund shareholders because it can dilute the value of their shares, if the market timer is exploiting pricing inefficiencies, or disrupt the management of the mutual fund's investment portfolio and cause the targeted mutual fund to incur costs borne by other shareholders to accommodate frequent buying and selling of shares by the market timer.

### The Columbia Funds' Disclosures

18.     The Columbia Funds are a group of funds currently owned by Fleet. This group includes several funds (*e.g.*, the Acorn, Newport, and Stein-Roe fund groups) that had belonged to Liberty until late 2001, when Liberty was acquired by Fleet. By September 2003, the names of the various fund groups Fleet owned had been changed so that all were uniformly referred to by the name Columbia.

19.     From 1998 through 2000, the prospectuses for various of the Columbia Funds contained disclosures stating that shareholders would be limited in the number of exchanges they could make during a given period. For example, the prospectuses for the Acorn Fund Group represented that investors would generally be permitted to make only up to four round trip exchanges per year, defining a round trip as an exchange out of one fund into another fund and then back again.

20. Further, starting in May 1999, certain of the Columbia Funds belonging to the Acorn Fund Group began representing in their respective prospectuses that "[t]he Acorn funds do not permit market-timing and have adopted policies to discourage this practice."

21. In the fall of 2000, a number of the Columbia Funds belonging to Liberty at the time began including in their respective prospectuses the following disclosure, which expressly stated that short-term or excessive trading was prohibited (the "Strict Prohibition"):

> The Fund does not permit short-term or excessive trading in its shares. Excessive purchases, redemptions or exchanges of Fund shares disrupt portfolio management and increase Fund expenses. In order to promote the best interests of the Fund, the Fund reserves the right to reject any purchase order or exchange request particularly from market timers or investors who, in the advisor's opinion, have a pattern of short-term or excessive trading or whose trading has been or may be disruptive to the Fund. The funds into which you would like to exchange may also reject your request.

22. By the spring of 2001, the rest of the Columbia Funds belonging to Liberty began including the Strict Prohibition in their prospectuses. Columbia Advisors retained this disclosure language upon Fleet's acquisition of the funds from Liberty, and in early 2002, adopted the same disclosure for most of the funds that had belonged to Fleet prior to the acquisition. In the Spring of 2003, Columbia Advisors amended the Strict Prohibition language in certain of the prospectuses to make clear that other funds distributed by Columbia Distributor similarly reserved the right to reject trade requests from market timers or investors with a pattern of short-term or excessive trading.

8

## Defendants Agreed to Allow Short-Term or Excessive Trading In Columbia Funds, in Contravention of Disclosures

23.     During the period from at least 1998 and continuing through summer 2003, Columbia Distributor managers entered into at least nine arrangements with investment advisers, hedge funds, brokers and individual investors allowing them to engage in frequent trading in particular mutual funds. All but one of these investors made multiple "round trips" (each round trip consisting of a purchase and subsequent sale) per month and some made hundreds of round trips during this approximately five-year period, in amounts totaling over $2.5 billion. Further, much of this trading was directly contrary to the prospectus disclosure for the funds in which it occurred.

### A.    *Ilytat's Arrangement and Trading*

24.     From April 2000 through October 2002, Ilytat, L.P., a San Francisco hedge fund, and its affiliates ("Ilytat") made almost 350 round trips in seven international Columbia Funds. A substantial number of these trades were made pursuant to an arrangement with Columbia Distributor and approved by Columbia Advisors, which allowed Ilytat to engage in frequent and short-term trading in the Newport Tiger Fund (the "Newport Tiger Fund"), an Asian equity fund.

25.     Through 2000 and early 2001, the prospectus for the Newport Tiger Fund noted that "[s]hort-term 'market timers' who engage in frequent purchases and redemptions can disrupt the Fund's investment program and create additional transaction costs that are borne by all shareholders." Starting in May 2001, the prospectus included the Strict Prohibition representation.

26. Notwithstanding the language in the prospectus, Columbia Distributor, with the approval of the Newport Tiger Fund's portfolio manager, allowed Ilytat, which it and Columbia Services identified as a market timer, to enter into a "sticky-assets" arrangement. Under this arrangement, Ilytat was to place $20 million in the Newport Tiger Fund, with two-thirds of that amount to remain static and one-third to be actively traded. According to internal calculations for the Newport Tiger Fund, Ilytat made purchases or exchanges totaling over $133 million in the fund in 2000 and redeemed $104 million. Further, during the first five months of 2001, Ilytat's purchases or exchanges accounted for $72 million out of the $204 million in total purchases made by all investors in the Newport Tiger Fund. During the same five-month period, Ilytat made redemptions totaling $60 million.

27. The portfolio manager for the Newport Tiger Fund repeatedly wrote to the President of Columbia Distributor expressing concern about Ilytat's trading activity and the harm that this trading activity could have on the fund and its investors. By June 2000, the head of Columbia Advisors became concerned that Ilytat appeared to be making weekly trades of $7 million in and out of the Newport Tiger Fund.

28. Notwithstanding these concerns, Ilytat was allowed to continue trading in the Newport Tiger Fund until September 2002. During the 30 months from April 2000 to September 2002 during which it actively traded in the Newport Tiger Fund, Ilytat made almost 90 round trips in amounts of up to $13 million apiece. This activity included over 30 round trips during the period from May 2001 through September 2002, when the fund's prospectus contained the Strict Prohibition representation.

29. Ilytat also traded extensively in the Acorn International Fund during the period from September 1998 through October 2003. From September 1998 through September 2000, the prospectus for the fund stated that investors would be permitted to make only up to four round trips per year. Further, as of May 1999, the prospectus for the fund stated that market timing would not be permitted in the fund. In addition, by the end of September 2000, the Strict Prohibition representation was included in the fund's prospectus.

30. Despite these representations, from September 1998 through October 2003, Ilytat made 73 round trips in the Acorn International Fund, including 27 round trips in 1999 and 18 round trips in 2000. From July 2000 to December 2001, the period during which it most actively traded the fund, Ilytat made at least 40 round trips in the fund in amounts of up to $15 million. This activity included 27 round trips made after the Strict Prohibition representation had been included in the fund's prospectus.

31. Ilytat also traded extensively in the Acorn International Select Fund during the period from July 2000 through June 2001. Throughout this period, the prospectus for the Acorn International Select Fund included the Strict Prohibition representation. Contrary to this representation, from July 2000 to June 2001, Ilytat made about at least 20 round trips in the Acorn International Select Fund in amounts of up to $3 million.

32. In addition, from September 1999 through October 2000, Ilytat also made more than 40 round trips (over 10 in 1999 and over 30 in 2000) in amounts of $100,000 or more in the Acorn International Select Fund, which went by the name Acorn Foreign Forty Fund at the time.

This trading activity was contrary to the representation in the prospectus for the fund that traders would be restricted to four trades per year and further, that market timing would not be permitted.

33. From August 2000 through October 2000, Ilytat also actively traded in the Stein Roe International Fund, making over 80 round trips of up to $1.4 million during this three-month period. In addition, from April 2000 to September 2000, Ilytat actively traded in the Newport International Equity Fund, making approximately 19 round trips during this five-month period in amounts of up to $2 million. During the eight-month period from February 2002 to October 2002, Ilytat also made at least 10 round trips of up to $16 million in the Columbia International Equity Fund (formerly the Galaxy Equity Growth Fund).

34. Neither Columbia Advisors nor Columbia Distributor disclosed to the investors or to the independent trustees of the Columbia Funds the arrangement with Ilytat or Ilytat's trading in the Columbia Funds.

### B. *Ritchie Arrangement and Trading*

35. From January 2000 through September 2003, Ritchie Capital Management, Inc. ("Ritchie"), a hedge fund manager, traded frequently in the Newport Tiger Fund and the Columbia Growth Stock Fund (formerly the Stein Roe Advisor Growth Stock Fund) ("Growth Stock Fund").

36. Ritchie made most of its trades in the Newport Tiger Fund. During the period from January 2000 through April 2001, notwithstanding the language in the fund's prospectus regarding the potential harm caused by short-term market timers, Ritchie made over 150 round trips. In addition, from May 2001 through September 2002, Ritchie made over 100 trades in the

12

Newport Tiger Fund even though the prospectus included the Strict Prohibition representation during this period.

37. In 2001, Columbia Distributor discussed an arrangement with Ritchie under which Ritchie would be allowed to make up to 12 round trips per year in the Newport Tiger Fund. In addition, at the end of 2001, Columbia Distributor's Senior Vice President met with Ritchie's principals and discussed the possibility of a "sticky-asset" arrangement. More specifically, they discussed the possibility of Ritchie placing "long-term" assets in a fixed income fund "to offset their activity in Tiger." The Senior Vice President's subordinate summarized the proposal as follows: "we would need to see some money from them...if they were going to continue to use Tiger." At the time, Ritchie's $52 million position in the Newport Tiger Fund accounted for nearly 10% of its $525 million in assets.

38. In early 2002, Ritchie began negotiating with Columbia Distributor an arrangement to actively trade the Growth Stock Fund, a large cap fund, which by then included the Strict Prohibition disclosure in its prospectus. Ritchie's initial proposal was to place up to $200 million in the fund (which at that time had a total asset value of approximately $776 million), with the ability to trade up to half of that amount every day. Columbia Distributor countered with a proposal to keep 90% of the investment in place for 90 days, with no limit on trades of the remaining 10%. Columbia Advisors' portfolio manager for the fund was aware of these negotiations and provided his input. Shortly thereafter, Ritchie began trading in the Growth Stock fund, making five round trips in two months in amounts of up to $7 million.

39. In early 2003, Ritchie entered into a "sticky-asset" arrangement with Columbia Distributor under which it agreed to place $20 million in the Growth Stock Fund, trade up to $2 million at a time with no limits on the number of trades per month, and place another $10 million in the Columbia Short Term Bond Fund as a "static" (non-trading) asset. The portfolio manager for the Growth Stock Fund approved the arrangement, and Columbia Distributor's President knew of and acquiesced to it. Overall, pursuant to its arrangements with Columbia Distributor and contrary to Columbia Advisors' Strict Prohibition representation in the fund's prospectus, Ritchie made approximately 18 round trips in the Growth Stock Fund from June 2002 through September 2003.

40. Neither Columbia Advisors nor Columbia Distributor disclosed to the investors or to the independent trustees of the Columbia Funds the arrangement with Ritchie or Ritchie's trading in the Columbia Funds.

C. *Stern's Arrangements and Trading*

41. During late 2002 and early 2003, entities controlled by Edward Stern ("Stern") negotiated trading arrangements with Columbia Distributor through two intermediaries. In early 2003, Epic Advisors, on behalf of Stern's Canary Investment Management firm, entered into an arrangement with Columbia Distributor, approved by its National Sales Manager, under which Stern entities agreed to make investments in three funds (*i.e.*, the Columbia Growth & Income Fund, the Columbia Select Value Fund, and the Growth Stock Fund, totaling $37 million. Despite the fact that Columbia Advisors had included the Strict Prohibition disclosure in the prospectus for each of these three funds, the arrangement permitted Stern entities to make three

round trips per month in each fund. Stern withdrew from the arrangement only a couple of weeks after making the investment.

42.     In late 2002 or early 2003, Stern also entered into an arrangement with Columbia Distributor pursuant to which he placed $5 million in the Columbia High Yield Fund (the "High Yield Fund"), a high-yield bond fund. Despite the fact that Columbia Advisors had included the Strict Prohibition disclosure in the prospectus for the High Yield Fund, Stern was permitted to make one round trip each month in the fund. The portfolio manager for the High Yield Fund approved the arrangement. During the period from November 2002 through July 2003, Stern made seven round trips in an average amount of $2.5 million.

43.     Neither Columbia Advisors nor Columbia Distributor disclosed to the investors or to the independent trustees of the Columbia Funds the arrangement with Stern or Stern's trading in the Columbia Funds.

D.  *Calugar's Arrangement and Trading*

44.     In or around April 1999, Daniel Calugar ("Calugar") reached an arrangement with Columbia Distributor allowing him to place up to $50 million in the Columbia Young Investor Fund ("Young Investor Fund"), a fund targeting investments by children with an "educational objective to teach children about mutual funds", and the Growth Stock Fund, with permission to make one round trip per month using his entire position. The portfolio manager for the Growth Stock Fund, as well as Columbia Distributor's Managing Director of National Accounts and Senior Vice President approved the arrangement.

15

45. In 2000, notwithstanding the supposed terms of the arrangement, Calugar, on average, made more than one round trip every trading day in various of the Columbia Funds. Throughout the year, Calugar made over 200 round trips in the Young Investor Fund, placing trades of up to $2.3 million at a time, and during the four-month period from January 2000 through April 2000, he also made at least 13 round trips in the Stein Roe International Fund.

46. During the period from January 2000 through February 2001, Calugar also made nearly 70 round trips in the Growth Stock Fund, placing trades of up to $4 million at a time. Throughout 2000 and into January 2001, he also made approximately 20 round trips in the Newport International Equity Fund, in amounts of up to $6.6 million.

47. Neither Columbia Advisors nor Columbia Distributor disclosed to the investors or to the independent trustees of the Columbia Funds the arrangement with Calugar or Calugar's trading in the Columbia Funds.

E.   *Giacalone Arrangement and Trading*

48. In late 2000, Columbia Distributor, with the approval of its President, entered into a "sticky-asset" arrangement with Sal Giacalone ("Giacalone"). Under the arrangement, which was approved by the head of the Newport Fund Group, Giacalone was allowed to make four round trips per month of up to $15 million in the Newport Tiger fund. In return, Giacalone was required to place $5 million in "long term assets" in Acorn Funds.

49. Notwithstanding the supposed terms of his arrangement and the language in the prospectus discussing the potential harm caused by short-term market timers, Giacalone made a total of 43 round trips in the Newport Tiger Fund during six months of trading from November

16

2000 through April 2001. During the first two months of 2001 alone, Giacalone made at least 30 round trips in amounts of up to $4.7 million.

50. Neither Columbia Advisors nor Columbia Distributor disclosed to the investors or to the independent trustees of the Columbia Funds the arrangement with Giacalone or Giacalone's trading in the Columbia Funds.

### F.   *D.R. Loeser Arrangement and Trading*

51. In late 1998, Columbia Distributor entered into an arrangement with D. R. Loeser ("Loeser"), a registered investment adviser, allowing Loeser to make five round trips per month of up to $8 million in the Growth Stock Fund. Columbia Distributor's Senior Vice President, the President of the Stein-Roe fund complex, to which the Growth Stock Fund belonged at that time, and the Growth Stock Fund portfolio manager all approved the arrangement.

52. During the first five months of 2000, Loeser made approximately 20 round trips in the Growth Stock Fund and another 20 round trips in the Young Investor Fund.

53. Neither Columbia Advisors nor Columbia Distributor disclosed to the investors or to the independent trustees of the Columbia Funds the arrangement with Loeser or Loeser's trading in the Columbia Funds.

### G.   *Signalert Arrangement and Trading*

54. Beginning in 1999, Signalert, a registered investment adviser, began trading in Columbia Funds under arrangements with Columbia Distributor. Initially, Signalert was allowed to invest $7.5 million in the Growth Stock Fund and $7.5 million in the Young Investor Fund, with the ability to make up to 10 round trips annually in each of these two funds. Under the

arrangement, Signalert was also to place $5 million in each of six funds, trading just once a quarter.

55.     Columbia Distributor senior management subsequently pushed to increase the size of Signalert's investments. In late 1999, as part of a "sticky-asset" arrangement, Signalert agreed to place an additional $10 million in the Growth Stock and Young Investor funds, and to invest and maintain other assets in a money market fund, thereby allowing Columbia Distributor to generate a management fee from those assets. In return, Columbia Distributor allowed Signalert to make up to 12 round trips per year in each fund. The portfolio manager for both the Growth Stock Fund and the Young Investor Fund approved this arrangement.

56.     During the first 11 months of 2000, notwithstanding the supposed terms of the arrangement, Signalert made over 60 round trips in the two funds, one every one to two weeks. Overall, during the period 2000-2001, Signalert made more than 50 round trips in the Growth Stock Fund and approximately 50 round trips in the Young Investor Fund. Moreover, as of February 2001, Columbia Advisors had represented by way of the Strict Prohibition disclosures in the prospectuses for these funds that short-term or excessive trading would not be permitted. Yet, from February 2001 through August 2001, Signalert made 20 round trips in the Young Investor Fund. It also made over 20 round trips in the Growth Stock Fund from February 2001 through December 2001.

57.     Signalert also began trading in four additional funds: the Stein Roe Income Fund (a bond fund), the Acorn Fund (a small to mid cap fund), the Galaxy Equity Value Fund (a large cap fund), and the Galaxy Growth & Income Fund. Despite the fact that the Stein Roe Income

Fund and the Acorn Fund both included the Strict Prohibition representation in their prospectuses, Signalert made eight round trips in the Stein Roe Income Fund, all in the month of November 2001, and at least 15 round trips in the Acorn Fund during the period from March 2001 through February 2003. In addition, notwithstanding the fact that the two Galaxy funds generally limited investors to three exchanges per year, Signalert made approximately 23 round trips in the Galaxy Equity Value Fund and more than 25 round trips in the Galaxy Growth & Income Fund in a period of less than a year, from February 2001 through January 2002.

58. Neither Columbia Advisors nor Columbia Distributor disclosed to the investors or to the independent trustees of the Columbia Funds the arrangement with Signalert or Signalert's trading in the Columbia Funds.

### H.  *Waldbaum's Arrangement and Trading*

59. During late 2002, Columbia Distributor entered into a "sticky-asset" arrangement with investor Alan Waldbaum ("Waldbaum") under which he was allowed to make 10 round trips per year in the Columbia Tax Exempt Fund ("Tax Exempt Fund"), a municipal bond fund, if he moved less than $5 million each time and always kept $2 million in the fund. The arrangement was approved by the portfolio manager for the Tax Exempt Fund.

60. At the time, the prospectus for the Tax Exempt Fund included Columbia Advisors' Strict Prohibition representation. Notwithstanding this representation, Waldbaum made 10 round trips in the Tax Exempt fund from November 2002 through October 2003.

19